PEOPLE *v.* ZABIJAK.

1. Criminal Law—Presence at Trial of Witnesses Indorsed on Information.

   Due diligence must be shown by the prosecutor to produce witnesses whose names are indorsed on the information, and where they are material witnesses, it is the duty of the prosecutor to have subpœnas issued and use other means at hand to have the witnesses present at the trial (3 Comp. Laws 1929, § 17254).

2. Same—Witnesses Indorsed on Information—Homicides.

   Indorsement of the name of a witness on an information does not involve any necessary obligation to do more than have him in court ready to be examined, but in homicide cases where the witness can give direct evidence on any material branch of the crime alleged he should always be called except where such witnesses are too numerous and testimony of those not called would be merely cumulative (3 Comp. Laws 1929, § 17254).

3. Same—Indorsement of Witnesses—Presence in Court.

   If a prosecutor indorses on the information in a homicide case the name of a witness who can give direct evidence on any material branch of the case, the prosecutor must have such witness in court but need not call him as a witness (3 Comp. Laws 1929, § 17254).

4. Homicide—Murder—Definition.

   Murder is committed when a person of sound mind and discretion kills another person with malice aforethought, either express or implied.

5. Criminal Law—Witnesses Indorsed on Information—Presence at Trial—Material Witnesses—Homicide.

   Failure of prosecuting attorney to exercise due diligence to have police officer present at trial of one charged with murder in the first degree after his name had been indorsed upon the information and after it appeared that he was a material witness on question of defendant's insanity prior to homicide *held,* reversible error (3 Comp. Laws 1929, § 17254).

6. Same—Insanity—Intent—Other Offenses.

   In prosecution for murder of defendant's mother-in-law in which defense of insanity at time of homicide was interposed, it was

relevant to show circumstances of shooting of his wife and
child before he proceeded to kill his mother-in-law, as bearing
upon his motive and intent, if those facts could be proved by
competent testimony (3 Comp. Laws 1929, § 17320).

7. WITNESSES—HUSBAND AND WIFE—EXCEPTIONS TO COMMON-LAW
RULE.

Common-law rule that testimony of husband or wife for or
against each other is to be excluded in both civil and criminal
proceedings has been whittled down by judicial interpretation
and by statute that neither shall testify for or against the
other without the other's consent except in suits for divorce
and prosecutions for bigamy or where cause of action grows
out of a personal wrong or injury done by one to the other (3
Comp. Laws 1929, § 14221).

8. SAME—INTEREST OR RELATIONSHIP—COMMON LAW—STATUTES—
CREDIBILITY.

Common-law rule rendering incompetent the testimony of in-
terested or related persons in civil or criminal proceedings has
been abrogated in this State by statute, which provides that
their testimony is competent but that nature of interest or
relationship may be shown for purpose of drawing in question
the credibility of such witness (3 Comp. Laws 1929, § 14217).

9. SAME—HUSBAND AND WIFE—EXCEPTIONS TO RULE AS TO INCOM-
PETENCY.

The rule of necessity has created exceptions to the general rule
making husband and wife incompetent witnesses in cases in-
volving the other, such exceptions being partly for the pro-
tection of the wife in her life and liberty and partly for the
sake of public justice.

10. SAME—HUSBAND AND WIFE—COMMUNICATIONS.

The word "communication," as used in statute excluding evi-
dence by husband or wife for or against the other, refers to
communications recognized by the law to be confidential (3
Comp. Laws 1929, § 14221).

11. SAME—FORMER WIFE LIVING APART FROM HUSBAND—COMPE-
TENCY—HOMICIDE.

Former wife of defendant in prosecution for murder of mother-
in-law *held*, a competent witness against him where at time
of murder they were not living together (3 Comp. Laws 1929,
§§ 14217, 14221).

12. SAME—HUSBAND AND WIFE—BURDEN OF PROVING MARRIAGE.

The burden of proving that the marriage relation exists between a proposed witness and another rests upon the party opposing the competency of the witness (3 Comp. Laws 1929, § 14221).

13. SAME—HUSBAND AND WIFE—BURDEN OF PROOF—EVIDENCE.

Defendant, in prosecution for murder of his mother-in-law, who was not living with his wife at the time of the murder and which wife had remarried some eight years prior to trial, *held*, not to have met his burden of proof that the marriage relation existed in order to exclude her testimony against him, the evidence requiring a finding that at the time of his trial there was no marriage relationship between defendant and such witness (3 Comp. Laws 1929, § 14221).

14. SAME—HUSBAND AND WIFE—THREATS OF MURDER.

In prosecution of defendant for murder of his mother-in-law in her home, testimony of his then wife with whom he was not living of threats of murder of herself and their baby in wife's house about a block away, after defendant had entered the house and locked the door, which were made shortly prior to murder of which defendant was accused *held*, properly admitted since they were not confidential communications within meaning of statute barring communications made by one spouse to another without the other's consent (3 Comp. Laws 1929, § 14221).

15. HOMICIDE—INSANITY—EVIDENCE.

In prosecution for murder of mother-in-law by defendant who interposed defense of insanity at time of homicide, finding of sanity commission and adjudication of court confining defendant in asylum for the criminal insane, was competent evidence at hearing upon question of whether defendant was insane at the time of the alleged murder, although both were made after the murder, hence, exclusion was error.

16. EVIDENCE—MENTAL CONDITION—SANITY COMMISSION—RELEVANCY—ADMISSIBILITY.

Question as to whether finding of sanity commission, made as result of hearing or inquisition held after time at issue in proceeding in which mental condition of person involved is drawn in question, is evidence of his condition at the time in issue is merely a matter of relevancy and not of the admissibility of the inquisition.

17. HOMICIDE—MENTAL CONDITION—EVIDENCE—OPINION OF MEDICAL WITNESS.

In prosecution for murder in which defense of insanity at time of the homicide is interposed, the facts admitted in evidence must be restricted to those which have some tendency to show the mental condition of the accused at the time of the act charged, hence admission of opinion of a medical witness, who did not appear as expert on mental diseases, as to what defendant might do if confronted by the same circumstances in the future was immaterial and irrelevant on question of sanity at time of the homicide, highly prejudicial to defendant on trial some 16 years later, and erroneous.

18. EVIDENCE—MENTAL CONDITION—NONEXPERT WITNESS.

A nonexpert witness who has had ample means to observe and form conclusions as to the mental condition of a person and who testifies to pertinent facts on which his conclusions are based may state his conclusions as to the insanity of a person.

19. CRIMINAL LAW — MURDER — INSANITY — EVIDENCE — LAY WITNESSES.

In prosecution for murder in which defendant interposed defense of insanity at time of homicide, testimony of lay witnesses consisting of conclusions of fact of such witnesses as to his conduct *held,* properly excluded.

20. SAME—MURDER—INSANITY—EVIDENCE.

In prosecution for murder in which defendant interposed defense of insanity at time of homicide, objection to allowance of answer to question by defendant's counsel to lay witness as to whether defendant's actions were different from what they had been before *held,* properly sustained as question was too indefinite and too pregnant with conclusions to be of any avail in adducing facts to prove insanity.

21. HOMICIDE—INTENT—MOTIVE—EVIDENCE.

In prosecution for murder of defendant's mother-in-law, statements alleged to have been made prior to the homicide in the nature of threats against wife were relevant to show intent and motive.

22. WITNESSES—THIRD PARTY WHO OVERHEARS CONVERSATION BETWEEN HUSBAND AND WIFE—STATUTES.

Testimony of witnesses who overheard conversation between defendant and his wife was not subject to rule excluding tes-

timony of married persons as witnesses against each other
even though conversation was intended to be private and
privileged as such third party may testify thereto in a suit
involving the subject-matter of the conversation overheard
(3 Comp. Laws 1929, § 14221).

Appeal from Genesee; Parker (James S.), J.
Submitted April 14, 1938. (Docket No. 116, Calendar No. 39,161.) Decided June 10, 1938.

Joseph Zabijak was found guilty of first degree murder. Reversed and new trial granted.

*Ralph M. Freeman*, for appellant.

McAllister, J.  On the afternoon of December 3, 1918, defendant, Joseph Zabijak, a married man who did not live with his wife, went to her home and after locking the door, confronted her with a gun and told her that he was going to kill her. His wife, with their baby in her arms, ran to another room where defendant pushed her on the bed, and while she was still holding the baby in her arms, shot three times, killing the baby and shooting his wife through the mouth. He then walked directly to the house of his mother-in-law, Louise Michalik, who lived about a block away on the same street, and shot and killed her. Defendant then walked to All Saints' church, about three blocks from where his mother-in-law lived, where he got behind the cross in front of the church and tried to kill himself by discharging the gun in his mouth. He was apprehended, confined in a hospital and charged with first degree murder for the killing of his mother-in-law. On being released from the hospital, he was arraigned in circuit court at which time a plea of not guilty was entered, and an attorney was appointed to defend him.

On petition of his counsel, the court appointed a sanity commission, which on February 21, 1919, adjudged the defendant insane, and ordered him removed to the State hospital for the criminal insane at Ionia. He was confined to the insane hospital for 15 years, except for a period when he escaped, and was returned to Genesee county in September, 1934. A sanity commission was again appointed and after an examination of defendant, concluded on December 20, 1934, that he was sane. On December 24, 1934, the prosecuting attorney went before the court and moved to dismiss the information against the respondent on the ground that all of the evidence available to the prosecutor indicated beyond a question that the defendant was insane at the time the homicides were committed. The court, however, after questioning the defendant, denied the motion. Counsel was appointed for defendant and the case came on for trial, the defendant pleading insanity as a defense. He was convicted of first-degree murder July 7, 1935, and was sentenced to life imprisonment. He appeals from such conviction.

There had been marital difficulties between defendant and his wife. On the day of the killing, she had been in court to get a divorce. Defendant had accused his mother-in-law of being responsible for his troubles. Many witnesses were sworn who testified as to his queer and peculiar conduct before the killings.

Indorsed on the information was the name of Edward Conley, who was a police officer at the time of the homicides, as well as at the time of the trial. Prior to resting the case for the people, the prosecuting attorney announced that he had been informed that Conley was in Ohio, and in response to defendant's counsel, stated that Conley could return by the next morning, during the trial of the case.

Defendant's counsel emphasized at the time that it was vital to have Conley present. As his last witness the prosecutor called a deputy sheriff who testified that he tried to serve a subpœna on Conley on Saturday before the trial started. The commencement of trial was on Monday. Conley was on his vacation at the time in Ohio. A telephone call was made but he couldn't be located; and he did not appear as a witness in the case. Defendant alleges that he should have been produced in court and that failure by the people so to produce him, constituted reversible error.

Conley's testimony on the trial would have related to a material and important fact. According to the affidavit of Conley, which was made a part of defendant's motion for a new trial, he had been called to defendant's home by the brother-in-law of defendant four or five weeks before the homicides. On arrival, he found defendant in bed covered up, and observed a number of whisky bottles in the room. On removing defendant from the bed, Conley noticed a slight wound about the size of a .22 caliber bullet on defendant's breast bone. On looking over the bed a small caliber revolver was found. Conley observed the defendant while he was in bed and noticed that his eyes were stary and glassy. It was impossible to have an intelligent conversation with him, and from his observations, Conley believed the defendant to be insane. Upon bringing the defendant to police headquarters, Conley advised his superior officer, Captain Gilbert, that he believed the prisoner was insane and that if permitted to run at large, he would kill someone. The captain replied that he did not know what they could do about it. Defendant was later released from jail. After the killings, Conley again went to his superior and reminded him that he had previously told him

that the man was insane. Conley further stated in his affidavit that he had related the foregoing facts to the prosecuting attorney before the trial of the case, and advised the prosecutor that it was his opinion from his long experience as a police officer that the defendant had been insane before the alleged murder.

It is obvious that Conley's testimony as a witness on behalf of defendant would be of transcendent significance. It is admitted that defendant was insane shortly after the homicides, and, by proper legal determination, was confined in the hospital for criminal insane. After his release from the insane hospital, he was tried and convicted on the ground that he was not insane on December 3, 1918, the day of the killings. Conley's testimony that, in his opinion, defendant was insane a month before this time would be important and would supply a substantial basis from which inferences could be drawn that defendant was insane at the time he shot his mother-in-law.

It is provided by 3 Comp. Laws 1929, § 17254 (Stat. Ann. § 28.980), as follows:

"All informations shall be filed during term in the court having jurisdiction of the offense specified therein, after the proper return is filed by the examining magistrate by the prosecuting attorney of the county as informant; he shall subscribe his name thereto, and indorse thereon the names of the witnesses known to him at the time of filing the same. Names of other witnesses may be indorsed before or during the trial by leave of the court and upon such conditions as the court shall determine."

Due diligence must be shown by the prosecutor to produce witnesses whose names are indorsed on the information, and where they are material witnesses, it is the duty of the prosecutor to have subpœnas is-

sued, and use other means at hand to have the witnesses present at the trial. *People* v. *VanVorce,* 240 Mich. 75.

The fact that the name of a witness is indorsed on the information does not involve any necessary obligation to do more than have the witness in court ready to be examined, but in cases of homicide where witnesses can give direct evidence on any material branch of the crime alleged, such witnesses should always be called, except, possibly, where they are too numerous. *Wellar* v. *People,* 30 Mich. 16. If the prosecutor indorses the name of such witness, he must have him in court but need not call him as a witness. *People* v. *Lummis,* 260 Mich. 170, 173.

"A defendant has the right to rely on the fact that such a witness will be present. If his counsel announces that he desires to examine him, the prosecution should call him to the stand, thus evidencing the fact that he has performed his duty in that respect." *People* v. *Lummis, supra.*

"It is the duty of the prosecuting attorney to furnish all the evidence within his power bearing upon the issue of guilt or innocence, in relation to the main issue, or to give some good excuse for not doing so." *People* v. *Swetland,* 77 Mich. 53, 57.

"The rule that the prosecution must indorse and call all the eyewitnesses to a crime of violence who are available, except when they are numerous, and those not called obviously would be merely cumulative, although rejected or materially modified in most or all other American jurisdictions (16 Ann. Cas. 918, note; 16 C. J. p. 846; 2 Michie on Homicide (1st Ed.), p. 1362), is too well established in this State to need the citation of authorities." *People* v. *Raider,* 256 Mich. 131, 134.

Whether defendant was insane prior to the homicides as well as thereafter was a material element in the offense charged.

"The defendant was on trial for murder. Murder is said to be committed when a person of sound mind and discretion unlawfully killeth any reasonable creature in being, and under the king's peace, with malice aforethought, either express or implied: 3 Coke's Institutes, chap. 8, § 500, p. 287b; 3 Inst. 47; 4 Blackstone's Commentaries, chap. 14, p. 195; 3 Chitty's Criminal Law, p. 724. These are the ingredients of the offense; the unlawful killing, by a person of sound mind and with malice; or to state them more concisely, the killing with criminal intent; for there can be no criminal intent when the mental condition of the party accused is such that he is incapable of forming one." *People* v. *Garbutt,* 17 Mich. 9, 21 (97 Am. Dec. 162).

The failure of the prosecuting attorney to exercise due diligence to have Edward Conley present at the trial after his name had been indorsed upon the information and after it had appeared that he was a material witness on the question of defendant's insanity prior to the homicides was reversible error.

On the trial, Louise Borkowski, who was defendant's wife at the time of the alleged murder, was sworn as a witness for the people and testified that defendant had come to her home and had told her that she was "going to get killed." She further testified that defendant afterwards threw her on the bed while she was holding the baby, shot the baby twice and shot her through the mouth, and after he had finished shooting, told her that he was going outside and was going to kill her mother.

Defendant's conduct, as testified to by his former wife, indicated that if he were sane at the time, he intended and planned to murder the entire family in

revenge for wrongs which he considered he had suffered. Counsel for defendant objected to this testimony on the ground that it was prejudicial and tended to prove defendant guilty of a crime other than that for which he was being tried.

Section 17320, 3 Comp. Laws 1929 (Stat. Ann. § 28.1050), provides:

"In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant."

In view of the defense of insanity, it was, therefore, relevant to show the circumstances of defendant's shooting his wife and child before he proceeded to kill his mother-in-law, as bearing upon his motive and intent, if such facts could be proved by competent testimony.

With reference to the testimony concerning the statements made by defendant to his wife at the time of the shooting, counsel for the defendant objected to its introduction on the ground that it contravened the statute relating to testimony of husband and wife for or against each other, and it is claimed that its introduction on the trial was reversible error. Section 14221, 3 Comp. Laws 1929 (Stat. Ann. § 27.916), provides:

"A husband shall not be examined as a witness for or against his wife without her consent; nor a

wife for or against her husband without his consent, except in suits for divorce and in cases for prosecution for bigamy, and where the cause of action grows out of a personal wrong or injury done by one to the other  *  *  *  nor shall either, during the marriage or afterwards, without the consent of both, be examined as to any communication made by one to the other during the marriage.''

It is said in 70 C. J. p. 118:

''Broadly, at common law, and under some statutes, husband and wife are incompetent as witnesses for or against each other in either civil or criminal proceedings, the rule of exclusion ordinarily applying irrespective of the kind of testimony offered, or the character of proceeding involved. But the rule of exclusion was subject to certain exceptions or modifications even at common law.''

The reason for the common-law rule prohibiting the testimony of husband or wife for or against the other appears to have been based upon the fiction of identity of persons; and because of such identity, it was held that in accordance with the common law, no one could testify for himself in his own cause; and likewise no one could incriminate himself.

''*Note*, it hath been resolved by the justices, that a wife cannot be produced either against or for her husband, *qua sunt duæ animæ in carne una.*'' 1 Coke upon Littleton, chap. 1, § 1, p. 6 b.

''But, in trials of any sort, they (husband and wife) are not allowed to be evidence for, or against, each other; partly because it is impossible their testimony should be indifferent; but principally because of the union of the person: and therefore, if they were admitted to be witnesses *for* each other, they would contradict one maxim of law, '*nemo in propria causa testis esse debet;*' and if *against* each other, they would contradict another maxim, '*nemo tenetur*

*seipsum accusare.' "* 1 Blackstone Commentaries, chap. 15, p. 443.

But many reasons based on various grounds have been given for the rule of exclusion of such testimony. 4 Wigmore on Evidence (2d Ed.), § 2228. The rule of exclusion has been substantially whittled down in late years both by statute and judicial interpretation.

Prior to 1881, in Michigan the accused was not permitted to testify under oath in his own defense in a criminal prosecution; he could merely make a statement to the jury. *People* v. *Thomas,* 9 Mich. 314. But this rule, directed against competency because of interest, was changed by statute. Act No. 245, Pub. Acts 1881 (How. § 7544). The rule excluding testimony of interested persons in civil or criminal proceedings has been abrogated in this State. 3 Comp. Laws 1929, § 14217 (Stat. Ann. § 27.912). After following for more than a century the common-law rule that a wife is incompetent to testify on behalf of her husband in a criminal proceeding in Federal courts, the Supreme Court of the United States recently, in the case of *Funk* v. *United States,* 290 U. S. 371 (54 Sup. Ct. 212, 93 A. L. R. 1136), held that this rule of evidence must yield where the experience of succeeding generations demonstrates the fallacy or unwisdom of such rule, and accordingly reversed the lower court for error in holding such testimony incompetent.

The rule of necessity has created exceptions to the general rule making husband and wife incompetent witnesses in cases involving the other, such exceptions being partly for the protection of the wife in her life and liberty, and partly for the sake of public justice. *State* v. *Vaughan,* 136 Mo. App. 645 (118 S. W. 1186); 1 Greenleaf on Evidence (16th Ed.), §§ 334, 335.

We are, however, confronted by a statute in this case and the applicability of its terms to the facts before us is elucidated by a reference to cases heretofore construing its provisions in this State. In *O'Toole* v. *Ohio German Fire Ins. Co.,* 159 Mich. 187 (24 L. R. A. [N. S.] 802), where the question was whether letters of a wife to her husband containing confidential communications which came into the possession of a third party without collusion were admissible as evidence tending to prove material facts in issue, and objection was made that such communications were protected by statute, the court said:

"The privilege is in derogation of the general rule that all persons may be compelled to testify concerning facts inquired about in courts of justice. It should be made effective, but ought not to be extended by the courts to cases where there has been no injury to the relation of the parties by the betrayal of the confidence reposed."

This court has further interpreted the meaning of "communication" as used in the statute, and has held that communications between husband and wife, excluded from evidence by the statute, are those recognized by the law to be confidential communications. *Hagerman* v. *Wigent,* 108 Mich. 192; *Ward* v. *Oliver,* 129 Mich. 300.

In *People* v. *Marble,* 38 Mich. 117, a woman was on trial for a murder committed in an attack by herself and others upon her husband and associates. At the time the murder was committed, defendant and her husband were married. They, however, were living apart in a state of mutual distrust and divorce proceedings were pending between them. Subsequent to the crime and prior to the trial, defendant's husband secured a decree of divorce against her. On the trial, the divorced husband was permitted to testify on behalf of the State against his former wife

as to the circumstances of the attack. It was objected that he was an incompetent witness and that his examination and the introduction of his testimony constituted reversible error. It was held on appeal that the examination of such witness and his testimony was not error and the court in passing upon the question, said:

"Now it cannot be positively admitted that if Marble had been sworn and examined subject to the authority of the common law, his previous state of marriage with the defendant would have been adequate ground for precluding him from testifying to those matters he was allowed to testify to. At the time of the trial no marriage relation existed, and for the entire period which commenced several months before the events of the fatal night and extended to the divorce, the relation was practically ended. There was no association and no confidential intercourse or communication. There was no amity. They lived apart in a state of mutual distrust and hostility, and the events described by Marble were open and aggressive acts against him and his associates Ayres and Morley, and according to his representation of the circumstances it appeared that the defendant and Chapman and Martin were acting in concert in waging the violence which was done. In giving evidence, so far as he was permitted, of what occurred on the night of the homicide, he revealed nothing which had come to his knowledge in consequence of the marriage relation, or which had arisen or been confided in the sacred confidence or privacy of married life. On the contrary, the facts he detailed were acts of force and violence directed against him and others, and in the presence of others.

"There would seem to be some reason for contending that the case would not be subject to the general rule of the common law which will not allow divorced parties to testify against each other concerning matters which occurred during the continuance of the

married state, but would be considered as standing on different ground and to be viewed as an exception. *Chamberlain* v. *People,* 23 N. Y. 85 (80 Am. Dec. 255) ; *Ratcliff* v. *Wales,* 1 Hill (N. Y.), 63; *Coffin* v. *Jones,* 13 Pick. (Mass.) 441; *Dickerman* v. *Graves,* 6 Cush. (Mass.) 308 (53 Am. Dec. 41) ; *Aveson* v. *Lord Kinnaird,* 6 East, 188 (102 Eng. Rep. 1258). But whatever force the point suggested may be supposed to possess, it is quite unnecessary to seek aid from it here.

"The statute of 1861, as previously considered by this court, affords a complete answer to the objections founded on the former relation between the witness and defendant. 2 Comp. Laws 1871, §§ 5966, 5969.

"By the terms of the first of these sections Marble was rendered generally competent notwithstanding his former marital relation; and since the relation had ceased when he was called, and as the prosecution 'was not in consequence of adultery,' there was nothing to qualify his general competency save the exception in the second of the above named sections, providing that without the consent of both, neither husband nor wife during the marriage or afterwards shall '*be examined as to any communication made by one to the other during the marriage.*' He was therefore competent at the trial and in this case to *testify against the defendant without her consent as to any matter except such a communication,* and no part of the evidence he was allowed to give was within the exception. No part of his testimony consisted of matter exposing anything written or spoken under the protection of matrimonial association. *Morissey* v. *People,* 11 Mich. 327 ; *Grimm* v. *People,* 14 Mich. 300; *Herrick* v. *Odell,* 29 Mich. 47.''

The statute of 1861 (2 Comp. Laws 1871, § 5966) referred to in the opinion of the court is the same as 3 Comp. Laws 1929, § 14217 (Stat. Ann. § 27.912), which is as follows:

"No person shall be excluded from giving evidence in any matter, civil or criminal, by reason of crime or for any interest of such person in the matter, suit or proceeding in question, or in the event of such matter, suit or proceeding, in which such testimony may be offered, or by reason of marital or other relationship to any party thereto; but such interest, relationship, or conviction of crime, may be shown for the purpose of drawing in question the credibility of such witness, except as is hereinafter provided."

The statute of 1861 (2 Comp. Laws 1871, § 5969) referred to in the court's opinion is similar to 3 Comp. Laws, 1929, § 14221 (Stat. Ann. § 27.916). It provides:

"A husband shall not be examined as a witness, for or against his wife, without her consent; nor a wife, for or against her husband, without his consent, except in cases where the husband or wife shall be a party to the record, in a suit, action, or proceeding where the title to the separate property of the husband or wife so called or offered as a witness, or where the title to the property derived from, through, or under the husband or wife so called or offered as a witness, shall be the subject-matter in controversy or litigation, in such suit, action, or proceeding, in opposition to the claim or interest of the other of said married persons, who is party to the record in such suit, action, or proceeding; * * * nor shall either, during the marriage or afterwards, without the consent of both, be examined as to any communication made by one to the other, during the marriage."

It will be observed that there are two relevant prohibitions in the statute; first, that a wife or husband shall not be examined for or against the other without consent obtained; second, that neither husband nor wife during the marriage or afterwards, without the consent of both may be examined as to any com-

munication made by one to the other during the marriage. With regard to the first prohibition, it has been held that after the marriage relation is ended neither husband nor wife can testify as to any matter which occurred prior to the divorce. *Hanselman* v. *Dovel,* 102 Mich. 505 (47 Am. St. Rep. 557). But in the *Marble Case* it was held that, under the circumstances, the divorced husband could testify against his wife as to matters which occurred prior to the divorce. In the case before us, as in the *Marble Case,* the parties were married at the time the homicide was committed and when the claimed communications were alleged to have been made; but they had not been living together and there was a divorce suit pending. In both cases there was a divorce before the trial of the criminal case; at the time of giving her testimony, the former wife of defendant Zabijak had been married to another man for 13 years. Under the authority of *People* v. *Marble, supra,* defendant's former wife was a competent witness against him in this case.

Counsel for defendant complains that the testimony did not show that the said witness was legally divorced from defendant Zabijak and that consequently the marriage relation still existed between them. It is, therefore, contended that the witness was incompetent for any purpose and that it was error to call her for examination. The burden of proving that the marriage relation exists between a proposed witness and another rests upon the party opposing the competency of the witness. *Lynch* v. *State,* 5 Ohio App. 16; Underhill Criminal Evidence (2d Ed.), § 189. Defendant did not meet this burden of proof and from the testimony we are obliged to conclude that at the time of defendant's trial there was no marriage relationship between him and the witness Louise Borkowski.

It is the further contention of the defendant that because in the *Marble Case*, the communications were made in the presence of others, that case is distinguishable from the facts before us, for the reason that such communications were not confidential. But neither were the communications made by defendant Zabijak to his wife confidential. They were not in the nature of an admission or confession or an act of which she otherwise might not be cognizant. Nothing was revealed in consequence of the privacy of the marriage relation. The statements testified to were in the nature of threats. They were made after the door of the house was closed and locked, but this was done, according to the theory of the State, not to secure secrecy with regard to the statements made, but to prevent the escape of the wife and child to safety, and to insure that there would be no interference from others in the carrying out by the defendant of his murderous intentions.

The testimony of Louise Borkowski did not injure the marriage relation of the parties by the betrayal of any confidence reposed in her by defendant, and was properly admitted by the trial court.

On the trial, counsel for defendant offered in evidence the finding of the sanity commission and the adjudication of the court confining defendant to the asylum for the criminal insane. The court excluded this evidence and it is claimed that the ruling was error. This evidence was competent as bearing upon the question of whether the defendant was insane at the time of the alleged murder.

In *Smedley* v. *Commonwealth*, 138 Ky. 1 (127 S. W. 485, 129 S. W. 547), the trial court excluded the record of a lunacy commission which was offered by defendant to show that he had been adjudged insane after an alleged offense and before the trial. On appeal the reviewing court held that the exclu-

sion of such record was prejudicial to the defendant and in its decision quoted with approval from Wigmore on Evidence (1st Ed.), § 1671, as follows:

" 'There is not, therefore, and never has been any doubt as to the admissibility of an inquisition of lunacy, in any litigation whatever, to prove the person's mental condition at the time. The only controversy has been whether it is conclusive, *i. e.,* whether it is to be regarded as a judicial proceeding and a judgment *in rem,* binding upon all persons whatsoever. There also arises for it the question whether the person's mental condition at the time of the inquisition is evidence of his condition at the time in issue; but this is merely a question of the relevancy of the fact evidenced by the inquisition and not of the admissibility of the inquisition.' "

In *People* v. *Farrell,* 31 Cal. 576, in a prosecution for a criminal assault, the defendant who had been committed to an insane asylum after the alleged crime, on the finding of a special jury impanelled to try the question of insanity, was later brought to trial. He offered as evidence of insanity at the time of the alleged offense, the verdict of the special jury. The evidence was excluded by the trial court. On review, the appellate court in passing upon this question, said:

"But the verdict was competent evidence upon the question whether the defendant was insane at the time of the commission of the supposed offense, especially in view of the statement of counsel that he proposed to accompany it with other evidence upon that point. In the proof of insanity under a plea of not guilty, though the evidence must relate to the time of the act in question, yet evidence of insanity before and after that time is admissible. (2 Greenleaf on Evidence (6th Ed.), § 690). The verdict was conclusive that the defendant was insane at the time it was rendered, and therefore ad-

missible as tending to prove that he may have been insane at the time the offense was committed. The verdict was rendered sometime after the act was committed, it is true, and may not have been entitled to much weight as evidence; but that is a different question, and no rule can fix, with precision, the limits of time within which evidence of subsequent insanity on the score of competency shall be received and beyond which it shall be rejected."

The exclusion of such evidence in the instant case by the trial court was error.

On examination by the prosecuting attorney, one of the medical witnesses was asked whether if the defendant found himself again confronted by the same circumstances that existed prior to the homicide in question he might do the same thing, and the witness was allowed to express his opinion that under such circumstances the defendant would do the same thing in the future. The witness was a general medical practitioner and it did not appear that he was qualified as expert on mental diseases. In *People* v. *Saccoia*, 268 Mich. 132, this court held that a medical witness, not an expert on mental diseases, could not testify as to what the mental condition of the defendant might have been prior to the time of the examination of the defendant by the sanity commission.

It is said in 32 C. J. p. 760:

"In all cases the question to decide has reference to the mental condition of the person whose sanity is in issue, at the very time of doing the act which is the subject of judicial investigation."

The facts admitted in evidence must be restricted to those which have some tendency to show the mental condition of the accused at the time of the act charged. The opinion of the medical witness as to what defendant might do in the future was not ma-

terial or relevant to the question of defendant's sanity at the time of the homicide and such evidence was highly prejudicial to the defendant as it may have very possibly influenced the jury in its verdict of guilty on the general principle that the defendant was an irresponsible and dangerous character and that it would be perilous to allow him to be at large. The question before the jury was not what defendant's mental and emotional condition was at the time of trial but whether he was insane on December 3, 1918. It was understood that at the time of trial defendant was sane. The admission of such evidence was erroneous.

Error is further claimed upon the rulings of the trial court excluding certain testimony of nonexpert witnesses as to whether defendant was insane prior to the homicide.

A nonexpert witness who has had ample means to observe and form conclusions as to the mental condition of a person and who testifies to pertinent facts on which his conclusions are based may state his conclusions as to the insanity of a person. *Paul v. Clements,* 176 Mich. 251, 256; *Lamb v. Lippincott,* 115 Mich. 611. See, also, *Beaubien v. Cicotte,* 12 Mich. 459, 502.

A review of the record discloses that the court's rulings with regard to the testimony of such witnesses was not erroneous. The testimony excluded consisted of conclusions of the witnesses not as to the insanity of the defendant but as to his conduct. Statements that "he talk too fast" and "he looked at that time funny," were not the conclusions of the witness as to whether defendant was insane. They were the witnesses' own conclusions of facts without definitely testifying to such facts. The question, asked by defendant's counsel: "Were his actions

different from what they had been before?'' was too indefinite and too pregnant with conclusions to be of any avail in adducing facts to prove insanity, and the court properly sustained an objection to the allowance of an answer thereto.

Counsel for defendant asserts that it was error to permit the testimony of witnesses relative to statements alleged to have been made by defendant prior to the homicides indicating that he was meditating violence against his wife. Such testimony was properly received. The statements alleged to have been made by defendant were in the nature of threats directed against his wife. ''Threats are relevant to show intent and motive, provided they were directed against the person injured.'' 16 C. J. p. 545.

With regard to the claimed error that the court improperly admitted testimony of witnesses relative to conversations between defendant and his wife which were overheard, such testimony was not subject to the rule of exclusion which covers the testimony of married persons as witnesses against each other.

A third party who has heard a conversation between husband and wife intended by him to be private and privileged may testify thereto in a suit involving the subject matter of the conversation. *Nash* v. *Fidelity-Phenix Fire Ins. Co.,* 106 W. Va. 672 (146 S. E. 726, 63 A. L. R. 101).

Our conclusions make it unnecessary to discuss various other questions raised on appeal.

For the errors pointed out the judgment of conviction for murder is reversed, the sentence of life imprisonment is set aside, and a new trial is ordered.

WIEST, C. J., and BUTZEL, BUSHNELL, SHARPE, POTTER, CHANDLER, and NORTH, JJ., concurred.