95 395
98 189
95 395
136 ³197

CATHERINE LYNCH, MARY A. McGRANE, MARGARET DOYLE, EDWARD DORAN, AND JOHN DORAN v.
JAMES DORAN, ELIZA DORAN, AND
JANE DORAN.

*Deed—Mental competency of grantor—Burden of proof—Evidence—Homestead—Conveyance by husband to wife.*

1. Where the transaction is equitable, the rule that the beneficiary under a deed alleged to have been secured by undue influence and from an incompetent grantor has the burden of showing an absence of such conditions does not apply.

2. The statute requiring a wife to join with her husband in a deed of the homestead does not prevent his conveying his interest therein to her.

3. Testimony of a daughter that her aged father sometimes addressed her by the name of another child, that he lost his way one night in a city near the farm where he lived, and that twice afterwards he was brought to her house, when she was told he had lost his way, does not show such a loss of memory as will justify any inference of incapacity; and the facts that he sometimes cried, and seemed low-spirited, and sat all day without talking unless spoken to, when he answered intelligently, are no evidence of his mental unsoundness.

Error to Wayne. (Gartner, J.) Argued February 17, 1893. Decided April 21, 1893.

Ejectment. Plaintiffs bring error. Affirmed. The facts are stated in the opinion.

*Edwin F. Conely* and *Orla B. Taylor,* for appellants, contended:

1. The conduct of relatives and others towards an individual is better evidence of what they think of his mental soundness than any term they can use to express it, especially when, without being experts, they recognize in him a condition of mental disorder, without thinking it amounts to insanity; citing *Jacox v. Jacox,* 40 Mich. 473.

2. In cases of this kind, wide investigation is permitted, and the mental condition of the grantor during a long period is admissible as bearing on his condition at the time of the execution of the deed; citing *Shailer v. Bumstead,* 99 Mass. 112.

3. We insist that, under the authorities, the court should have charged the jury that this was a suspicious affair, and should be closely scrutinized, and that the burden was upon the defendants to show that the deeds were fairly obtained and were untainted with fraud and undue influence. It is not claimed that there was any consideration for the deeds. Nor does any reason appear upon the record why the three beneficiaries should have been preferred to the other children; citing *Jacox v. Jacox,* 40 Mich. 473; *Duncombe v. Richards,* 46 Id. 166; *Raynett v. Baluss,* 54 Id. 469; *Crawford v. Hoeft,* 58 Id. 1; *Gates v. Cornett,* 72 Id. 420; *Crips v. Towsley,* 73 Id. 395; *Churchill v. Scott,* 65 Id. 485; *Sponable v. Hanson,* 87 Id. 204; *Allore v. Jewell,* 94 U. S. 506; *Long v. Long,* 9 Md. 348.

4. The burden of showing that John Doran was competent at the time the deed was executed also rests with the defendants. It is substantially agreed on all hands that in 1862 he was weak-minded, and so continued for about two years. The plaintiffs' testimony tends to show that that condition continued to the time of his death. This condition being established, the presumption is that it so continued, and it rests with the defendants to show either that he recovered, or that he had lucid intervals, during one of which the deed was executed; citing *Dicken v. Johnson,* 7 Ga. 484; *Attorney General v. Parnther,* 3 Brown. Ch. 441; *Hall v. Warren,* 9 Ves. 605; *White v. Wilson,* 13 Id. 87.

*John Atkinson,* for defendants.

GRANT, J. Plaintiffs and defendants are the heirs at

law of John Doran and Mary Doran, all being their children except John, who is a grandson, his father being dead. John Doran, the father, died March 28, 1882, ninety-three years old. His widow, Mary, died in 1885, aged about 80. Mr. Doran purchased the land in controversy—19 acres—in 1836. It was a farm, and occupied as a homestead till the time of his death. Soon after, the defendants moved to Detroit, taking their mother with them. April 17, 1879, Mr. Doran executed a deed of this land to his wife. About two weeks after, she executed a deed of it to the defendants. They had 10 children, two of whom died,—Patrick, the father of plaintiff John, in 1855, and John in 1860, without issue. Catherine married and left home in 1849, Patrick in 1851, Margaret in 1849, Mary in 1852, Anna in 1860, and Edward left home in 1870, and was married some years afterwards. James, Eliza, and Jane were never married. James and Jane lived at home. Eliza worked in Detroit, but spent considerable of her time at home. She took care of her father during his last sickness. Jane did the household work, and James worked and managed the farm. They all lived together as one family. For about 20 years previous to his death the father did such work as he chose, and as was consistent with his age and strength. None of the children, after leaving home, contributed anything to the support of their parents. The defendants also paid their father's funeral expenses, borrowing the money from Mary, which they repaid with interest. The parents were taken care of and supported by the defendants. The relations between the parents and children were pleasant and friendly, as were also the relations of the children to each other. The married children lived in Detroit, and there was the usual amount of visiting to and fro.

On January 17, 1887, plaintiffs commenced this suit to recover the undivided five-ninths of this land on the ground

of the incompetency of Mr. Doran to execute the deed. At the conclusion of the evidence the court directed a verdict for the defendants, holding that the plaintiffs had introduced no evidence tending to show incompetency.

This small piece of land comprised decedent's entire estate, and at the time of the deed was worth about $2,500. He was considerably affected by the death of his two sons, and especially mourned the loss of John. Soon after John's death he had a severe fit of sickness, and plaintiffs claim that his mental decay commenced at that time. He was then 71 years old, and up to that time was strong, both physically and mentally.

His daughter Margaret testified that after this sickness he lost his memory; that that condition continued right along; that when she met him he did not know her and her sister Eliza apart; that once when she went there she said, " Good morning." He replied, " Good morning, Eliza." She said, " I am Margaret." He replied, " Well, it is all the same." That once when he was at her house he said to her, " Eliza, I would like to treat all my family alike if I had my own way." She could give no other instances similar to these. That during the last few years of his life he used to sleep about noon-time, and then get up and walk around, or sit in the house,—" maybe go after the cows, or something like that." She once saw him crying. She asked him what was the matter, and he made no reply. She saw nothing else in his conduct that was strange, except that he sometimes seemed low-spirited, and would sit all day without talking to any one except when they spoke to him, when he would answer them. That he used to come to her house in Detroit once in two or three weeks; that he went to Trinity church about once a year; that he lost his way one night, coming from the church, and looking for her house; that he then said he was looking for Trinity church, but could not find it.

This occurred many years previous to his death. That he was brought to her house twice afterwards, when he lost his way in the city. This witness was then asked to give her opinion as to whether he was of sound mind from the time of his sickness. This testimony was excluded.

Albert Messmore lived about half a mile from Mr. Doran for many years before his death, except that occasionally he lived a year or more in the city. He testified that he was quite intimate with the family; that he visited there evenings, and sometimes in the day-time; that he (Mr. Doran) was in a pretty fair condition physically; that he made no pretentions to carry on the farm for the last 25 or 30 years of his life; that he (witness) never saw him doing anything, except with a spade letting water off the field, or something of that kind; that he supposed the reason he did not work was old age; that he had often met him on the road, when sometimes he would know witness and sometimes he would not; that if witness spoke to him, and talked to him a while, he would know him; that when he met him he would generally say, "Good morning, Mr. Doran;" that Mr. Doran would come up to him, and shake hands, but would not appear to know him; that when he told him who he was he would know him; that he would say, "Is it Ab.?" that Mr. Doran used to call him "Ab.;" that he had met Mr. Doran upon the road, when he asked him the way to go home; he would say, "I am turned around,—I do not know which way it is;" that he was then about half a mile from his house, which was not in sight; that he remembered particularly only two or three such instances; that the last one he remembered was in the neighborhood of ten years before Mr. Doran's death; that when he went there evenings Mr. Doran was generally in bed; that when he went there day-times he was walking around, or in the house reading; that about ten years before his death he met Mr. Doran looking after the cows,

which then ran at large, and Mr. Doran asked him if he had seen them; that he was about the same ever since witness could remember. On cross-examination the witness testified that he might have met him two or three times when he failed to recognize him; that he (witness) was then about 21 years old; that he (witness) had been away from home a little while before that; that Mr. Doran remembered him all right when he told him he was Ab. On redirect examination he testified that sometimes Mr. Doran would know him and sometimes he would not. This witness was asked whether he considered Mr. Doran, on the 17th of April, 1879, in such a condition mentally that he would comprehend the matter of the disposition or deeding away of his property, but the question was excluded as incompetent.

Mary testified that she left home when 16 years old; that she went home once in a month or two; that she lived in Detroit; that her father's health was pretty good; that he was troubled with dizziness in his head; that he lost his memory, and could not recognize her very well; that when she told him who she was he would recognize her; that once when he visited her in Detroit, when he was about 80 years old, he bade her good-bye, crying, and said perhaps he would not see her again. She made no reply to this. He went right away, and walked home; a distance of over four miles. She gave one instance of dizziness which occurred at the beginning of his sickness after John's death. Plaintiffs' counsel asked her the following question:

" *Q.* Did you ever have any conversation with him, or was he ever talking with you, when his talk or conversation or language made you think that he did not know what he was talking about, or that his memory was failing?
" *A.* No, sir; not as I remember."

She testified that he did chores around the farm. On

cross-examination she said, "My memory is awfully poor." She was then 60 years old. She could not remember a single irrational thing that her father ever said, and she never asked him a question to which he did not make an intelligent answer.

Edward Doran testified that his father's health was good enough; that he once had à spell of sickness, and witness thought he was a little weak-minded; that the basis of this opinion was that sometimes he saw him crying, at other times he would be singing,—just humming over something; that he would go away somewhere, and get astray; that witness sometimes went after him, and found him a mile or a mile and a half from the house; that witness sometimes told him he was sent after him, when he became pretty cross, and once was going to slap witness for coming after him; that he did chores around the house; that he had dizzy spells, but witness could not say how frequently; that at different times he cried, and told him and his brother James to go on and do the best they could,—that pretty soon they would not have anybody to watch over them. He was better at times. Witness had no conversation with him which indicated a loss of memory. He met his father once in Detroit, on Grand River avenue, in the company of two young men. He said he was going with these boys. He (witness) told him he had better come with him, which he did. The boys said they were going to have some fun with him; that they thought he was simple or drunk. This was 20 years or more before he died. Once he went to Trinity church with him, on Sixth street. On coming out of the church they got separated, and witness found him down around Ninth street. He asked him where he was going, and he said he was going home. Witness replied, "If you are, you better turn around, and go the other way." He turned around, and

came with him.   They had walked that morning from the farm to the church, about four miles.   He sometimes went after the cows, and sometimes he found them and sometimes he did not.   Witness did not have much conversation with him.   His father always recognized him; knew his voice when he spoke to him.   His eye-sight was not good. He read books and papers.   Tò the best of his opinion, his father was getting worse all the time.   On cross-examination witness said he did not attend his father's funeral, although he was living in the city; that he was off and on away from home from the time he was 14 years old till he was 22.   After he left home for good he went back occasionally.   He (witness) sometimes cried and sometimes sang; it depended upon what was on his mind.   His father occasionally drank intoxicating liquor, but did not think he had drank any when he met him with the two young men.   He knew one of the young men, but did not know the other; had seen him at Trinity church. The church incident happened some seven or eight years before his death.   Witness started from the church up Sixth street,—the way they used to go.   Not seeing his father, he turned back to look for him, and saw him just as he got to Ninth street.   It was just as near to go by Ninth street as it was by Sixth street, but his father had started across Porter street, which was out of the way. There was no unusual incident in the way of conversation on that day.

Michael Mimnaugh was a nephew of Mr. Doran.   About 17 years before the trial, which was in April, 1892, he lived in Greenfield, at his father's, about three-quarters of a mile from Mr. Doran's.   He testified that he visited at Mr. Doran's house probably once in three or four weeks,— sometimes not so often; that Mr. Doran's health was very good part of the time, and part of the time it was not;

that he was once a long time sick, after which his health was not so good as it had been before; that he had spells of crying, and when witness asked him what he was crying for he said he did not know; that these crying spells were not very frequent; that Mr. Doran told him he got lost going after the cows; that one evening, when witness was driving home from the city, he overtook Mr. Doran, and said " Good evening, uncle," but he did not seem to notice it.   Witness was riding in a wagon, and Mr. Doran was walking.   Witness told him who he was, and he said he was looking for the cows.   He was then between half and three-quarters of a mile from his home; said he had got turned around, and did not know which way to go, and witness told him.   Witness could tell no other incident when he did not know him.

"*Q.* Now, have you any other matter on your mind that you can recall that made you think he was not right mentally?

"*A.* Well, all I remember about he acted kind of simple, and did not seem to do any business at all.

"*Q.* You say he acted kind of simple.   What do you mean by that?

"*A.* Well, I mean he walked around, and never paid much attention to anybody or anything.

"*Q.* Absent-minded?

"*A.* Yes, sir."

Witness further said that, as near as he could get at it, Mr. Doran's condition was pretty much the same down to his death; that he once saw him digging a zigzag ditch along a rail fence.

"*Q.* Now, in regard to the old gentleman, state what his conversation was when you talked with him, whether you could understand him or not, whether it was intelligent.

"*A.* Oh, I could understand him.

"*Q.* Always?

"*A.* Well, pretty much always.

"*Q.* I ask you if it was always.   I did not ask you

pretty much always.    When I say always, I mean always; not pretty much always.

"*A.* Well, I could understand him."

On cross-examination, referring to the conversation with Mr. Doran upon the road, witness testified that he drove up behind Mr. Doran, and first asked him where he was going; that he said he did not know,—that he was looking for the cows; that witness told him he did not see them; that Mr. Doran said he had got turned around, and did not know exactly where he was, or which way he was going; that witness told him he was going the wrong way,—to turn around, and go back.    The only reason witness had for swearing that Mr. Doran did not recognize him was because Mr. Doran did not speak to him at all until he (witness) spoke to him.    He first said, "Good evening, uncle," and then they went on with the conversation above given.

Valentine Doran was a nephew, and lived on an adjoining farm, and was occasionally at Mr. Doran's; occasionally worked there.    He testified that for about 30 years before his death Mr. Doran went around doing nothing; that he was in good physical health, and did not use to be sick at all; that he often met him and spoke to him, when Mr. Doran replied, "I don't know whom I am speaking to,—I don't know you;" that when he told him who he was he replied, "I am blind, and I don't know anybody, or I don't know anything."    He was totally blind in one eye.    Never heard him say anything else which indicated his condition.    He saw Mr. Doran bringing in wood and digging ditches.    That he knew him to wander away, and get turned around or lost; that he once went after him, and found him in the city, at his aunt's, Mr. Doran's sister.    This was about 20 years before his death.    Witness never found him out in the country when he was lost.  · He sometimes met him in the after-

noon, when he forgot that he had met him in the morn-
ing.    That his condition did not improve, and that for
some time before his death he did not go off the farm
much.    On cross-examination witness testified that he had
met him when he said he did not ·know where he was
going, but that he might then have been looking for the
cows; that he (witness) had no excuse for saying to Mr.
Doran that he had spoken to him in the morning, but
that he said it because he wanted to tell him that he had
been speaking with him a short time before.    " Question.
You found Mr. Doran in the city at his sister's, and you
call that lost?"    To this question the witness made no
answer.    All the reason he then had for saying he was
lost was because he found him at his sister's, and left him
there.    He could give no other instance within his per-
sonal knowledge.

Thomas M. Harris knew Mr. Doran 20 years before his
death.    Worked on the farm a week or 10 days in 1874.
Mr. Doran did not know who he was till his daughter
Jane told him.    He thought he was nearly blind in one
eye.

"Q. From what do you judge that he did not know who
you were?

"A. Because I think the old gentleman was so old and
feeble.

"Q. No, no.    What did he say or do that showed that?
"A. He did not speak to me at all unless Miss Doran
told him who I was, and then he would converse with me
for a short time."

His daughter Jane said to witness:    "Don't pay any
attention to father.    He don't know what he is talking
about."    Said this once or twice.    After that witness
occasionally visited at Mr. Doran's, and said his "condition
became worse, because he was getting older; his condition
was worse, and he was more childish."

"*Q.* What did you see on these occasions that made you think he was childish?

"*A.* Well, from the conversation I would have with him. He would be talking of things that would not be just exactly in my memory, that I think would be proper for an old gentleman to converse about.

"*Q.* He would make irrational answers, is that what you mean?

"*A.* We had talks in regard to the weather, or something; and he would tell me in different ways from what I thought the weather would be, and something about the farm.

"*Q.* What would he say?

"*A.* He would tell me in regard to when a storm would be going to approach when it would be quite clear, and there were not the signs of a storm whatever. I would ask him how he knew we were going to have a storm. Then he would start to tell me from studying through almanacs. I would ask him how he knew, and he would tell me by the weather that was approaching."

Upon cross-examination, on being asked what there was wrong in Mr. Doran's saying there was to be a storm if the almanac did, he replied, "Because I thought the old gentleman was so old that he would have predicted it without studying."

The above is all the evidence tending to show incompetency or mental incapacity on the part of Mr. Doran to execute this deed. The evidence that he failed at times to recognize certain persons must be considered in view of the fact that during the period covered the sight of one eye was entirely gone, and that of the other was considerably affected. It is unnecessary to state the evidence on the part of the defendants. It was in direct conflict with the plaintiffs' evidence upon those facts which are claimed to establish incompetency. If the plaintiffs made a case from which mental incapacity may fairly be inferred, they were entitled to have the case submitted to the jury.

1. The opinions of decedent's daughter Margaret and Mr.

Messmore as to his mental condition were properly excluded. Neither had testified to any conduct, acts, or language which showed any incapacity to understand the nature of a will or deed. Margaret gave no instances of loss of memory except that he sometimes addressed her by the name of one of his other children; that he lost his way one night in the city, and twice afterwards was brought to her house, when she was told that he had lost his way. These constitute no proof of such loss of memory as to justify any inference of incapacity, and therefore an opinion based upon them is incompetent. The facts that he sometimes cried, that he sometimes seemed low-spirited, and sat all day without talking unless some one spoke to him, when he answered, and, it appears, intelligently, are no evidence of mental unsoundness. The loss of his children is an ample excuse for this conduct. It would be strange, indeed, if a father or a mother could be held insane or unsound in mind because they cried over the death of a beloved child, even though this occur years after the death. Margaret had testified to nothing inconsistent with mental soundness or sanity, and therefore no foundation was laid for her opinion. The testimony of Mr. Messmore was still weaker, and comment upon it is unnecessary.

2. There was nothing inequitable or unjust in the disposition of his little property. The defendants supported their parents during a long old-age, treated them kindly and affectionately, nursed them during their sicknesses, and paid all the expenses of their sickness and funerals. His other children left home about as soon as they were able to earn anything, and went to work for themselves. The property did not constitute more than a reasonable compensation to the defendants for their services and care. There is no room, therefore, for the inference that plaintiffs were unjustly dealt with by their parents in this disposition of their property, or to attach any suspicion to

the transaction; or that these parents were the wards of the children who took care of them, so as to throw the burden of proof upon them of the absence of undue influence and of competency. Where the transaction is equitable, no such rule can apply. The burden of proof was, therefore, upon the plaintiffs.

The record shows this old man to have been one of unusual strength and vigor. He is not shown to have possessed any other than the infirmities common to his age. He worked upon the farm as much as his disposition and strength permitted, and took the usual interest of a man of his age in the ordinary affairs of life. He is not shown to have uttered a single irrational sentence, or not to have understood any question that was ever put to him. Both he and his wife trusted these defendants to take care of them in their old age, and yielded the control of the farm and the household very largely to them. The result shows that their confidence was not misplaced. There is no evidence of any undue influence, or of any complaint on the part of these defendants of the care of their parents. They kept up the home, to which the other children had free access, and made frequent visits to their parents, and were always welcome by all. These old people knew that they had not long to live. It is a fair presumption that they understood that the share of the property to which the defendants would be entitled as their heirs at law would not be a sufficient compensation, and that all of it would not be too much. There is nothing in the entire evidence on the part of the plaintiffs to indicate that either Mr. Doran or his wife did not possess sufficient mental capacity to understand the nature of this transfer of their property, an act which in itself was eminently just.

I have heretofore expressed my views of this class of testimony which is being used to impeach wills and deeds,

and to permit juries to substitute their own ideas of what a grantor or testator ought to do with his property for those of the testator or grantor himself. *Prentis v. Bates,* 88 Mich. 567.

· The circuit judge was correct in his holding. I concur in the following language used by him in his charge to the jury:

" All the acts shown may be true, and still it could not be said that by reason thereof any evidence of mental incompetency would be shown. If conveyances are to be set aside for such pretexts as are here shown, very few could bear the test of legal scrutiny and be safe from attack. If a man's acts, by reason of such incidents as have been shown in this case, make such act the subject of *post-mortem* determination, dependent upon the whims or caprices of a jury, then it may well be said by him who wishes to convey his property, 'I wish my property to go so and so, and hope that a jury will upon the subject think the same as I do, and confirm my act.'"

3. It is insisted that the deed from Mr. Doran to his wife is void, because she did not join in the deed. The statute does not prevent the husband from conveying his interest in the homestead to his wife by deed. To require a deed from herself to herself would be senseless. But the question is settled in this State against the plaintiffs' contention. *Stevens v. Castel,* 63 Mich. 111.

Judgment affirmed.

HOOKER, C. J., MCGRATH and LONG, JJ., concurred. MONTGOMERY, J., did not sit.