PEOPLE *v.* HANNUM.

1. JURY—HOMICIDE—SPECIAL POLICE OFFICER.
   Fact that one of the jurors in homicide trial was a township police officer and special deputy sheriff of the county served to deprive defendant of a trial by an impartial jury.

2. HOMICIDE — DIRECTED VERDICT — EVIDENCE — EQUALLY DIVIDED COURT.
   Defendant, charged with homicide, *held,* not entitled to directed verdict, where admissible lay testimony, other than opinion testimony, presented question for jury as to' defendant's sanity at time she slew her husband, the Court being equally divided as to admissibility of opinion testimony of lay witnesses who were police officers.

Appeal from Calhoun; Hatch (Blaine W.), J. Submitted October 13, 1960. (Docket No. 73, Calendar No. 48,301.) Decided March 1, 1961.

Louise Hannum was convicted of manslaughter. Reversed and new trial granted.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, and *Noble O. Moore,* Prosecuting Attorney, for the people.

*Mustard, Clagett & Everett,* for defendant.

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 31 Am Jur, Jury § 73.
   Police officers or other law enforcement officers as qualified grand or petit jurors in criminal cases. 140 ALR 1183.
[2] 26 Am Jur, Homicide § 555. ·

DETHMERS, C. J.   On August 8, 1956, defendant shot and killed her husband.  She was arrested that day and taken to the city police station.  On the way to the station she made statements and admissions to a policewoman about the killing.  Two days later she was arraigned.  Shortly before the arraignment she made admissions to another police officer about getting a gun, her husband's struggling with her for possession of it, and his being shot.  Both officers were permitted to give testimony about those admissions and statements at trial.

After arraignment defendant was examined by 2 psychiatrists at the request of the prosecuting attorney.  They stated that, in their opinion, she was insane.  A petition to fix a time and place for hearing to inquire into and determine the issue of insanity was filed, an order entered accordingly, and a hearing was had on September 12, 1956.  On that date the court determined that defendant was insane and incapable of understanding the nature and object of the proceedings against her and of assisting in her defense in a rational or reasonable manner.  The court, therefore, ordered defendant committed to the Ionia State Hospital until restored to sanity, all in compliance with CL 1948, § 767.27 (Stat Ann 1954 Rev § 28.967).

On November 8, 1957, the medical superintendent of the hospital notified the court that defendant was restored to sanity and requested her removal therefrom.  On November 13, 1957, the court ordered defendant's removal from the hospital and retention in the county jail for trial on a murder charge, as in the mentioned statute provided.  On January 16, 1958, defendant moved to dismiss on the ground that no cause of action existed against her because of her insanity at the time of shooting her husband.  The motion was denied and defendant ordered to stand trial.

Defendant next filed notice of intention to claim

insanity as a defense. On trial a jury found her guilty of manslaughter. The court sentenced her to serve from 10 to 15 years in the Detroit House of Correction. Motion for new trial was denied. Defendant appeals.

Defendant claims error in denial of her motion to dismiss before trial because it had been established, so she says, by judicial proceedings that she was insane when the offense was committed. Reference is to the mentioned sanity proceedings. Although the 2 psychiatrists had testified at those proceedings that it was their opinion, based on their examination of defendant 2 days after the shooting, that she then was and for some time prior thereto had been insane, the court made no such determination. It found only that on the date of hearing she was insane and incapable of assisting in her defense. The statute above cited provides for the kind of proceedings here had, at the time and under the circumstances here presented. It further provides that under such circumstances, upon certification by the hospital superintendent of restoration to sanity, defendant shall be brought to trial. As indicated in *In re Roberts,* 310 Mich 372, the determination in the sanity proceedings, commitment and subsequent discharge from the hospital in no way relieved defendant from standing trial thereafter. The determination of insanity in the proceedings did not relate to defendant's condition at the time of shooting. That question was for determination by the jury at time of trial. The motion to dismiss was properly denied.

Defendant further claims error in reception of testimony of lay witnesses at trial that defendant was sane. The policewoman who took defendant from the scene of the crime to jail and there observed her during the next 2 days until arraignment testified that, in her opinion, defendant was sane. Another police officer, who had seen and talked with de-

fendant at the jail, testified to the same effect. A third officer testified that he had observed defendant for 1/2 hour and had seen nothing abnormal. Defendant complains that their testimony was incompetent because a proper basis was not laid for its admission. She urges that it was not shown that the officers had known defendant before her arrest or had had sufficient opportunity to observe her thereafter. Her reliance is on *O'Connor* v. *Madison,* 98 Mich 183. There this Court held, in a will contest, that the testimony of a lay witness as to a testator's incompetency was admissible only when it appeared that the witness was sufficiently acquainted with the testator and that it was not error for the court to require such witness to state all the circumstances upon which his opinion was based before permitting him to state his opinion. Cited also is *People* v. *Zabijak,* 285 Mich 164, 185, in which this Court said:

"A nonexpert witness who has had ample means to observe and form conclusions as to the mental condition of a person and who testifies to pertinent facts on which his conclusions are based may state his conclusions as to the insanity of a person. *Paul* v. *Clements,* 176 Mich 251, 256; *Lamb* v. *Lippincott,* 115 Mich 611. See, also, *Beaubien* v. *Cicotte,* 12 Mich 459, 502."

Defendant says the officers in the instant case did not have ample means to observe and form conclusions. In *Zabijak,* however, the testimony held properly excluded did not consist of the lay witnesses' opinions of defendant's insanity but rather their conclusions as to what the facts were about defendant from which insanity might be inferred. Also, it is to be observed that in *O'Connor* and in *Zabijak* the test laid down was for qualification to testify as to insanity. In the case at bar the situation is reversed, the question

going to competency of evidence of sanity. In *People* v. *Borgetto,* 99 Mich 336, 341, 342, this Court said:

"The subject has recently been discussed in the case of *O'Connor* v. *Madison,* 98 Mich 183, where the authorities are collected, and where it is held that a witness cannot be permitted to state that a testator was mentally incompetent until he has detailed some circumstances which the court can say tend to show it. *. *. *

"But there is a difference in the nature of the testimony requisite as bases for opinions in the 2 cases of sanity and insanity. The former is the normal condition; the latter, the abnormal. The latter is based upon unnatural conduct; the former may safely rest upon the absence of unnatural action or language. Once it is shown that the witness has a sufficient acquaintance under circumstances that give a reasonable opportunity for judging, and the testimony that he saw nothing unusual or abnormal is competent. What is required to show a sufficient opportunity depends upon circumstances which may properly move the judicial discretion, the testimony being more or less valuable as the circumstances are convincing. In the language of that case, when, 'taken as a whole, they move the judicial discretion of the trial judge, by apprising him that the witness may believe in the competency of the person upon reasonable grounds,' the opinion may be given."

Defendant also cites *People* v. *Saccoia,* 268 Mich 132. There this Court upheld the trial court's rejection of testimony of a doctor who did not claim to be an expert on mental diseases, of his opinion of defendant's mental condition before the doctor had examined or known him after having testified that defendant was sane when he examined him. The case is inapplicable here as the officers testified only concerning their opinion that defendant was sane on

the day of the offense and immediately following it when they saw her.

We think no error was committed in the admission of the lay testimony on the basis of the opportunities they had to observe defendant, the extent of which was made known to the jury. The question was not one of admissibility but, rather, one of weight to be given the testimony by the jury.

Error is assigned on reception of the testimony of an officer about statements or admissions of defendant made to him a day or more after arrest but before arraignment, relying on *Mallory* v. *United States,* 354 US 449 (77 S Ct 1356, 1 L ed 2d 1479). This case was tried 2 years before our decision in *People* v. *Hamilton,* 359 Mich 410. There we made clear our views on failure of officers to take accused before a magistrate promptly for arraignment and the inadmissibility of confessions wrung from the prisoner before such belated arraignment. In the instant case, however, statements made by defendant to officers immediately after the shooting and testimony of bystanders about defendant's *res gestae* statements, so clearly established the facts that the testimony of statements made to police 2 days later could scarcely have had prejudicial effect.

Defendant claims that testimony as to defendant's extrajudicial admissions was erroneously received when the *corpus delicti* had not been established by independent proofs. This went to the matter of lack of proofs of premeditation or malice aforethought, a necessary element of murder in the first degree of which defendant stood charged. When the evidence of such admission was offered and objection made on the grounds of lack of other proofs of *corpus delicti,* the prosecuting attorney moved to amend the information by striking out the words "wilfully or with malice aforethought." The court, over defendant's objection, allowed the amendment and per-

mitted the testimony. The jury ultimately convicted
defendant of manslaughter. There can be no doubt
that, as to manslaughter, there were sufficient proofs
to establish the *corpus delicti* and that the testimony
of said admission was then properly received. On
new trial defendant will, of course, stand charged as
in the amended information set forth.

Inasmuch as we hold the lay testimony as to sanity
to have been admissible, there is no basis for defend-
ant's claim that she was entitled to a directed verdict.

That defendant is entitled to a new trial we think
cannot be doubted. In the county in question each
member of the jury panel was required to fill out a
questionnaire with information about his employ-
ment as well as many other matters. After trial, it
was determined that one of the jurors was, at the
time of trial, a township police officer and special
deputy sheriff of the county. This the juror did not
disclose in the questionnaire nor on *voir dire* exam-
ination. In *People* v. *DeHaven,* 321 Mich 327, a con-
viction of statutory rape was reversed and new trial
granted by this Court because 2 jurors, on *voir dire*
examination, had, in effect, denied that they or any
of their relatives had been involved in a similar case
or any case involving the crime of rape, although one
was a cousin and the other a brother-in-law of a man
who several years before had been convicted in that
same court of the same offense and sentenced to life
imprisonment. This Court held that this had de-
prived defendant of his right to be tried by an impar-
tial jury, because the family experience of the 2
jurors was such as to have deprived them of the
capacity to act impartially in the case. Would any
experienced trial lawyer, or, for that matter, the pub-
lic generally, feel differently as to the capacity of a
local police officer to sit as a juror and consider im-
partially the case of a defendant charged with a
crime committed in the community? We think not.

That the lack of disclosure of the pertinent fact can be attributed to failure to expressly ask the prospective juror about it can hardly be thought to have insured an impartial trial any more so than in *De-Haven,* merely because there the panel members denied such disqualification.

Our disposition of the case makes consideration of other questions raised by defendant unnecessary.

Reversed. New trial granted.

Carr, Kelly, and Black, JJ., concurred with Dethmers, C. J.

Souris, J. (*concurring*). I concur in reversal and remand for new trial for the reason stated in the Chief Justice's opinion. However, I believe that prejudicial error was committed also by the trial court in admitting the opinion testimony of 3 nonexperts under the circumstances disclosed by this record.

During presentation of the State's case, the 2 doctors who testified at defendant's commitment proceedings* were called as witnesses for the people. On cross-examination, each testified that in his opinion as an expert defendant was insane at the time of the shooting, that she could not then distinguish between right and wrong. No other expert medical opinions were offered by the State. At conclusion of the State's case, defendant moved for a directed verdict of not guilty by reason of insanity, which motion the trial judge denied on the ground that the testimony of lay witnesses, that in their opinion defendant was sane at the time of the shooting, created a question of fact for determination by the jury. Three police officers testified that, in their opinion, defendant was sane. Defendant objected at the time

---

* CL 1948, § 767.27 (Stat Ann 1954 Rev § 28.967).

the testimony was offered and contends before us that the trial court erred in admitting such nonexpert opinion testimony over objection. Defendant contends that the lay witnesses' opinion testimony should not have been admitted; that if it had not been admitted the only evidence of defendant's mental condition at the conclusion of the State's case would be the testimony of the 2 doctors, both of whom testified she was insane; and that defendant's motion for directed verdict should have been granted. I agree with defendant that the nonexpert opinion testimony should have been excluded, but I do not agree, for reasons later stated, that her motion for directed verdict should have been granted.

Defendant claims there was no proper basis laid for the admission of the opinion testimony by the lay witnesses over her objection. None of the police officers had known defendant before her arrest and each had observed her only for brief periods of time thereafter. Sergeant Tomlinson, of the Battle Creek police department, was at the police station when Mrs. Hannum was taken into custody about 1 hour after the shooting. His entire observation of her lasted about 1/2 hour. He testified:

"During the half hour she sat with her hands kind of wringing together, her head hanging down and saying, as I said before, that she was sorry—'God forgive me,' and things like that."

Over objection, he was allowed to testify that he observed nothing "abnormal".

Lieutenant Alice Sherratt, a Battle Creek policewoman, was sent to the Hannum home to take Mrs. Hannum to the police station. On the way to the police station, in the witness' car, defendant was crying and began to scream. Lieutenant Sherratt testified:

"Then she stopped screaming and settled down for a little bit, and then she said, 'He is dead, I know it, I planned it that way. I planned it that way. A bullet was marked for me, too.' She screamed some more and then she covered her hands to her face and she said, 'Now she can't have him. She can't have him. She can't have him.'   *   *   *

"She covered her face with her hands and she screamed a little bit and then she said that—she said, 'I invited him over. I wanted to plead with him to come back to me. He had been living with another woman.' And at this point we had stopped at Riverside drive and East Fountain, and she said, 'I don't want to live. I don't want to live.' And she tried to get out of the car and I slammed on the brakes and grabbed ahold of her. She began to struggle, and I was afraid I couldn't hold her, so I was trying to get the police radio to have dispatch send me some help, and I talked to her and told her we would have to go into the station and to be calm. So she did stop struggling, and by this time cars were blowing their horns because we had quite a few cars there in sort of a traffic jam. Traffic was heavy this time of day. It was about quarter to 5. So I proceeded slowly to drive on to the station, and then she again said that, 'He is dead. I know it. Now neither one of us can have him. She can't have him. I can't have him.' And again I asked her who she was, and she said, 'Katherine.' I said 'Katherine who?' She said the last name but in saying it she was crying and screaming and I never did make out that last name. As near as I can recall, that's about it."

Upon arrival at the police station, Mrs. Hannum was booked and Lieutenant Sherratt next had occasion to talk to her the following morning for about 30 minutes and in the midafternoon for about 1 hour:

"I talked to Mrs. Hannum. I also had her in my office. Had her sit down where it was more comfortable. We talked about many matters. I asked her

about her family and about her home life. I talked to her about her husband, why he had left the home. Was she in financial duress and need. How long had he been out of the home. Had he come back to visit her. And we talked about things in just—that involved her own personal home life, and she was very rational with me and calm. * * * I asked about the gun; and she just told me she had had it for a long time, and that was the only reference that was ever made to the gun."

Lieutenant Sherratt was asked if, in her opinion, defendant appeared sane. Over objection, she replied:

"My opinion is that she was acting as a normal person. * * * She was sane."

Lieutenant Harry Wilson, of the Battle Creek police department identification bureau, first saw defendant on the day after the shooting. He fingerprinted and photographed her and talked with her for 10 or 15 minutes at that time. It was he who told Mrs. Hannum that her husband was dead. On the following day, he spent almost 1 hour and a half with her in his office, during which time she told him in detail about events immediately preceding the shooting, and about which he was allowed to testify in detail. Based upon these opportunities for observation, he was allowed also to testify over defendant's objection that in his opinion defendant was sane. It was this officer who, on cross-examination, was asked:

"*Q.* Mr. Wilson, if the proofs in this case were to develop that on the afternoon of August 10th [the day Lieutenant Wilson spent 1-1/2 hours with defendant], Mrs. Hannum, while in custody, was examined by 2 psychiatrists who had practiced in their field for many years, and if the proofs established that after that examination that each said that she

was insane, would that alter the opinion which you have offered here today at all?

"*A.* No, sir, it would not."

The only additional qualification offered as a foundation for the opinion evidence of witnesses Tomlinson and Sherratt was that Sergeant Tomlinson, during his 7 years on the police force, and Lieutenant Sherratt, during her 15 years on the police force, had had occasion to handle people who were insane.

The trial court admitted the opinion testimony of the lay witnesses over defendant's objection because in his view the objection that the limited opportunities for observation of defendant by the witnesses went to the weight to be given by the jury to the opinion testimony and not to its admissibility. Mr. Chief Justice DETHMERS agrees. I disagree. The opinion testimony from the 3 police officers should have been excluded.

*O'Connor* v. *Madison,* 98 Mich 183, involved a will contest in which testimony of nonexpert witnesses was offered to the effect that testator was incompetent. What this Court said in that case (at pp 187–189) regarding the admissibility of such nonexpert opinion testimony should have, in my view, at least equal applicability in this criminal case:

"The opinion of a witness upon the question of the competency of a testator is admissible only when it appears that the witness was sufficiently acquainted with him to be able to form an opinion; and it may be considered settled that the trial court may properly require the witness to state all of the circumstances upon which his opinion is based before permitting him to state his opinion, and perhaps it would not be a great stretch of discretion if he permitted cross-examination before allowing the opinion to be given. An opinion that a man is incompe-

tent must be supported by some evidence that is inconsistent with competency. Hence, it is for the court to pass upon the competency of the witness, and, unless there is something that legitimately tends to show incompetency [of the testator], the opinion cannot be taken; and we cannot approve the course taken in this case, of repeatedly asking the opinion of the witness without a full showing of the circumstances within the knowledge of the witness. Eliminating such opinions as were given, there is no testimony fairly tending to show incompetency. * * *

"The opinions of acquaintances upon the subject of competency are admissible where the witness is shown to have had the means of observation. This was fully discussed by Mr. Justice CAMPBELL in the case of *Beaubien* v. *Cicotte,* 12 Mich 459. * * *

"This opinion, if read in the light of the writer's [*i.e.* Justice CAMPBELL'S] opinion in the case of *White* v. *Bailey,* 10 Mich 155, 161, leaves no room for doubting that it is the settled law of Michigan that an opinion that a testator was incompetent can only be given when the witness has testified to circumstances upon which it is predicated, and which to some extent justify it. *White* v. *Bailey,* 10 Mich 155, 161; *Beaubien* v. *Cicotte,* 12 Mich 459; *Rice* v. *Rice,* 50 Mich 448; *Kempsey* v. *McGinniss,* 21 Mich 123; *Prentis* v. *Bates,* 88 Mich 567, 93 Mich 234 (17 LRA 494). The extent to which such proof must go cannot be limited by an inflexible rule. It must depend upon the familiarity of the witness with the testator, the character of the disqualification, the nature and number of extraordinary circumstances detailed, and proximity to the act involved in point of time. Taken as a whole, they should move the judicial discretion of the trial judge, by apprising him that the witness may fairly doubt the competency of the person upon reasonable grounds (*Prentis* v. *Bates,* 93 Mich 234, 242; *Lynch* v. *Doran,* 95 Mich 395); and this discretion must be carefully exercised (*Rice* v. *Rice,* 53 Mich 432). We have carefully examined the testi-

mony in the case, and find no witness who was qualified to testify to such a fact under this rule."

The controlling principle by which admissibility of nonexpert opinion testimony is determined is stated in *People* v. *Zabijak,* 285 Mich 164, at p 185:

"A nonexpert witness who has had ample means to observe and form conclusions as to the mental condition of a person and who testifies to pertinent facts on which his conclusions are based may state his conclusions as to the insanity of a person. *Paul* v. *Clements,* 176 Mich 251, 256; *Lamb* v. *Lippincott,* 115 Mich 611. See, also, *Beaubien* v. *Cicotte,* 12 Mich 459, 502."

There is in this statement a clear implication that if the nonexpert witness has *not* had "ample means to observe and form conclusions as to the mental condition" concerning which his opinion is requested, that he may *not* state his conclusion. Determination of the sufficiency of the nonexpert's "means to observe and form conclusions", in short, the admissibility of his conclusions, is the trial judge's function.

In *Prentis* v. *Bates,* 93 Mich 234, at p 241, it is said that "the trial judge should, as a preliminary question, determine whether there is any basis shown by the testimony of the witness for an opinion". It is precisely at this point defendant contends the trial judge erred in the case at bar. Recognizing, as was said in *Beaubien* v. *Cicotte,* 12 Mich 459, at p 503, that "no rule can be laid down declaring what amount of acquaintance or what opportunities are necessary to enable an observer to be a witness", I think the opportunities for observation of the 3 lay witnesses here involved were so limited that the trial court erred in admitting the opinion testimony based upon such limited observation.

Sergeant Tomlinson "observed" defendant for 1/2 hour on the day of the homicide. Lieutenant Sher-

ratt spent about 1 hour with her on the day of the homicide and talked with her for about 1-1/2 hours over the course of the following day. Lieutenant Wilson spent 10 or 15 minutes with her on the day after the homicide and almost 1-1/2 hours the following day. What transpired during these periods of "observation" has been detailed above. If there is anything in the testimony of Sergeant Tomlinson's 1/2 hour observation of defendant sitting "with her hands kind of wringing together, her head hanging down and saying  *  *  *  that she was sorry—'God forgive me,' and things like that", which to *any* extent justifies (*O'Connor* v. *Madison, supra*) his opinion that defendant's conduct was not abnormal, or which establishes any basis for his having formed *any* credible opinion, the path is clear for *any* nonexpert to express an opinion on any subject. Similarly, Lieutenant Sherratt's testimony of the events transpiring in her police car during the ride from the scene of the homicide to the police station would hardly justify her conclusion that defendant was normal, was sane. The balance of her testimony quoted above merely relates that she talked with defendant about many matters, without detailing any, and concludes with her opinion that defendant was rational and calm. Lieutenant Wilson's testimony was of a different sort. It was detailed and concerned his conversation with defendant about the shooting. It comes closer to satisfying the controlling principle quoted above from *People* v. *Zabijak* than does the testimony of the other witnesses, but in my view it is not close enough.

It may be granted that the trial judge necessarily must exercise discretion in admitting or excluding opinion testimony from nonexperts. However, before admitting nonexpert opinion testimony on a matter as vital as the sanity of a defendant being tried for a capital offense, his discretion should be ex-

ercised by resolving all doubts in favor of defendant. The trial judge should have done so in the case at bar by sustaining the defendant's repeated objections to the opinions elicited from witnesses Tomlinson, Sherratt and Wilson.

The exclusion of the opinions of those witnesses, however, does not require our reversal of the trial court's denial of defendant's motion for directed verdict. It is true that without the opinions as to sanity of the 3 police officers, the only *opinion* evidence on this point was that of the 2 doctors who testified that in their opinion defendant was insane. However, there was in the case other evidence, including testimony other than opinion testimony from the 3 police officers, from which the jury properly might conclude that defendant was sane notwithstanding the experts' opinions to the contrary. A jury question remained, and defendant's motion for directed verdict was properly denied.

Notwithstanding the foregoing, for the reason stated at the beginning of this opinion, I concur in reversal.

SMITH, EDWARDS, and KAVANAGH, JJ., concurred with SOURIS, J.