PEOPLE v ALSTEENS

OPINION OF THE COURT

1. CRIMINAL LAW—EVIDENCE—SANITY—LAY WITNESS—ADMISSIBILITY —WEIGHT.

Lay witness testimony regarding the sanity of a defendant in a criminal case involves a question of weight to be given the evidence rather than one of admissibility.

2. CRIMINAL LAW—EVIDENCE—SANITY—LAY WITNESS—ADMISSIBILITY.

Lay witness testimony regarding the sanity of a defendant in a criminal case was properly admitted where the nature of the testimony confirmed defendant's sobriety and sanity rather than revealing any unnatural conduct or language, where no objection was made to the admission of the testimony, no motion for new trial was made by defendant, the witnesses were thoroughly cross-examined as to their opportunity and ability to observe the defendant which established a sufficient basis for the witnesses to testify as to the appearance and demeanor of defendant, and where the subsequent admission of expert witness testimony of sanity and insanity creates considerable doubt as to whether the lay witness testimony on that point would have created any substantial error resulting in a miscarriage of justice.

3. CRIMINAL LAW—FORENSIC PSYCHIATRIC EXAMINATION—TRIAL—EXAMINING PSYCHIATRIST—TESTIMONY—OBJECTION—PRESERVING QUESTION.

The alleged error of permitting a psychiatrist who conducted a forensic psychiatric examination for the purpose of determining competency to stand trial to testify during criminal proceedings

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 21 Am Jur 2d, Criminal Law §§ 48, 53.

[3, 6] 21 Am Jur 2d, Criminal Law §§ 48, 65, 69, 74.

[4] 40 Am Jur 2d, Homicide § 289.

Homicide: identification of victim as person named in indictment or information, 86 ALR2d 722.

[5] 40 Am Jur 2d, Homicide §§ 44, 53.

[7] 21 Am Jur 2d, Criminal Law §§ 233, 326.

on the issue of insanity was invited by the defendant by his stipulating to the use of the testimony in a pretrial agreement, and the defendant's lack of objection in the trial court did not properly preserve the question on appeal.

4. HOMICIDE—PREMEDITATION AND DELIBERATION—EVIDENCE—PHOTO-GRAPHS—ADMISSIBILITY.

The prejudicial effect of the introduction into evidence in a murder prosecution of photographs of the deceased which tend to prove deliberation and premeditation and are offered to acquaint the jury with the circumstances surrounding the scene of the crime may be outweighed by their materiality; it was of probative value to permit the jury to view photographs of the deceased in order to demonstrate the malicious motive of the killing, where the defendant would not concede premeditation and deliberation.

5. HOMICIDE—SECOND-DEGREE MURDER—SENTENCES—JUDGE'S RE-MARKS.

A trial judge did not err in imposing a sentence of life imprisonment on a defendant upon a conviction of second-degree murder by stating at sentencing his belief of defendant's guilt of murder in the first degree where the record does not reveal that his opinion regarding the defendant's conduct formed the basis for imposing the maximum sentence allowable; the sentence of life imprisonment for second-degree murder is within the statutory provisions and sentences falling within the statutory limit are reversed only in the most extraordinary circumstances (MCLA 750.317).

CONCURRENCE IN RESULT BY O'HARA, J.

6. CRIMINAL LAW—FORENSIC PSYCHIATRIC EXAMINATION—WITNESSES—EXAMINING PSYCHIATRIST—STIPULATION.

*A clear and unequivocal stipulation by a defendant at a pretrial conference that a psychiatrist who conducted the examination at the forensic center to determine the defendant's competence to stand trial could be called as a witness by the prosecution in the case in chief precludes review of the admissibility of the testimony at trial.*

7. CRIMINAL LAW—APPEAL AND ERROR—RECORD.

*Record deficiencies in a criminal appeal cannot be cured by attaching after-the-fact affidavits to the appellate brief.*

Appeal from Dickinson, Ernest W. Brown, J.

Submitted Division 3 June 4, 1973, at Grand Rapids. (Docket No. 13491.) Decided September 24, 1973. Leave to appeal applied for.

Edward J. Alsteens, Jr., was convicted of second-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Francis D. Brouillette,* Prosecuting Attorney (Prosecuting Attorneys Appellate Service, *Thomas R. Lewis,* Director, and *James D. Hunter,* Staff Attorney, of counsel), for the people.

*Judith K. Munger,* Assistant State Appellate Defender, for defendant.

Before: R. B. Burns, P. J., and Fitzgerald and O'Hara,* JJ.

Fitzgerald, J. Defendant appeals from a jury conviction of second-degree murder[1] for which he received a sentence of life imprisonment. The facts and circumstances involved will be presented, followed by a *seriatim* discussion of the four issues raised on appeal.

Defendant testified to events leading up to and following the shooting death of Police Officer Kenneth Moraska in Norway, Michigan during the early hours of Sunday, May 23, 1971. His testimony revealed the difficulties he had encountered in holding a job, the strained relationship with his wife, and his previous experiences and hallucina-

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] MCLA 750.317; MSA 28.549.

tions from drug use. Between the hours of 6 o'clock p.m. Saturday, and 2 o'clock a.m. Sunday, defendant visited several drinking establishments and consumed a substantial amount of beer. Upon returning to his home at approximately 2 o'clock a.m. on Sunday, he phoned the police station requesting that Officer Moraska come to the house. Defendant remembered loading his father's rifle, hearing a loud noise, and standing over the body of Officer Moraska. This recollection was substantiated by what were termed as flashbacks, that is, experiences in which neither defendant's presence nor the occurrence itself are recalled with any degree of certainty, yet they have been impressed upon his memory to the extent that he is able to describe them. These flashbacks include observing Moraska enter the driveway, exit the patrol car, and walk up to the house. During an interrogation conducted subsequent to his eventual apprehension, defendant stated he was outside the house when Officer Moraska arrived. He admitted to firing two shots, the first from a distance and the second at point-blank range.

Defendant further testified to events following the shooting. He drove the patrol car seven miles to Benton Lake, returned to Norway, proceeded to Felch, and then on to Escanaba where he purchased gasoline for the patrol car. From there he backtracked through Felch, gaining entrance to a nearby cabin by shooting the lock off the door. Defendant remained in the cabin for the rest of the evening. At about noon on Sunday, the owners of the cabin, Mr. and Mrs. William Frazer, together with their three children, approached the cabin in their car. As two of the children walked toward the cabin on foot, defendant opened the cabin door and emerged, pointing both his rifle

and Officer Moraska's pistol at the Frazers. He instructed them to stand behind an old truck and ordered them to throw the car keys into the woods. After they complied with his request, defendant then turned and ran up the road. Soon after, he was apprehended by the State Police a short distance away.

A typed statement prepared from an interrogation session was signed by the defendant. He stated he did not like the deceased, blaming Moraska's arrest of defendant for disorderly conduct as the reason he and his wife were unable to reconcile their separation. Though his original plan was merely to hit Officer Moraska, he had decided that evening to kill him.

At trial, four witnesses testified to defendant's appearance and demeanor during the night of the shooting. Ronald Orler, chaperoning a dance held at the Norway Teen Center, observed defendant at various times between 9:30 and 11 p.m. and noticed nothing unusual. He described defendant as being "sober and normal, well-behaved", although he had not personally known or talked with defendant previously. Marvin Hanson testified that he played at least two games of pool with defendant at the Norway Hotel between the hours of 1 a.m. and 2 a.m. Sunday morning. He drove the defendant to his home following the pool games and noticed nothing unusual. Gordon Wills, Jr., had known defendant since childhood and had seen him once a month during the past year. He was with defendant at the Teen Center and later accompanied him to defendant's house. While outside the Teen Center, Wills and defendant observed Officer Moraska drive by, at which time defendant stated he was going to kill Moraska. On cross-examination, Wills testified that this expres-

sion was a manner of speech among their friends.
Wills noticed nothing unusual in defendant's man-
ner of speech, attitude, or appearance. William
Zanona, bartender at the Norway Hotel on the
night in question, observed defendant playing pool
and spoke briefly to him. Zanona saw defendant
once or twice a week and knew him quite well. He
noticed nothing unusual except for the fact that
defendant appeared "generally quieter".

Dr. Emery E. Ulrich, defendant's psychiatrist,
testified that defendant was suffering from acute
brain syndrome due to the combined effect of
alcohol and LSD. This was described as a revers-
ible disorder in the nature of a toxic illness affect-
ing one's ability to integrate perceptions. He
stated that defendant would be incapable of form-
ing the intent to kill and exhibited an unaware-
ness of any object in carrying out a planned activ-
ity. He appeared to be under considerable stress
because of his loneliness, his wife's absence, and
his perceived rejection.

The people's psychiatrist, Dr. Leon J. Quinn,
described defendant as one suffering from "delir-
ium", the symptoms of which would be obvious to
a layman. He considered defendant to be suffering
from a character or personality disorder and not
an acute brain syndrome at the time of the killing.
This diagnosis is not considered a mental illness
and does not impair one's ability to distinguish
right from wrong. Nor does it affect the ability to
resist acting upon impulse.

It is first alleged by defendant that it was error
to admit testimony of lay witnesses concerning the
sanity of defendant without an adequate founda-
tion indicating their acquaintance with and close
observation of defendant. He argues that the fail-
ure of the people to lay a proper foundation by

sufficiently establishing each witness's relationship to the defendant which would enable them to testify to defendant's mental condition on a comparative basis renders their testimony inadmissible. *People v Cole,* 382 Mich 695; 172 NW2d 354 (1969). The people contend that its witnesses did not provide opinion testimony as to defendant's sanity. Rather, they offered fact testimony material to rebut the inference of intoxication which may have precipitated the alleged insanity.

We note at the outset that defendant's reliance upon *People v Cole, supra,* ignores the fact that no controlling majority opinion was rendered in that case. Justices KAVANAGH, DETHMERS, and BRENNAN concurred upon the necessity to lay a foundation for lay witnesses' opinion evidence of sanity or insanity, requiring that the witness have the opportunity to observe the speech, manner, habits, or conduct of the person in addition to establishing sufficient acquaintance with the defendant so as to be able to testify on a comparative basis. Justice ADAMS concurred in the result, but relied upon the rule stated in *People v Zabijak,* 285 Mich 164, 185; 280 NW 149, 157 (1938), that "[a] nonexpert witness who has had ample means to observe and form conclusions as to the mental condition of a person and who testifies to pertinent facts on which his conclusions are based may state his conclusions as to the insanity of a person". Justice KELLY concurred specially, stating that insufficient evidence was introduced to prove defendant's sanity. Reversal in *Cole,* then, was based upon either the lack of opportunity to compare the witness's conduct on different occasions, the lack of ample means to observe, form conclusions or testify to the facts upon which the conclusions were based, or the insufficiency of evidence to outweigh that

which casts a reasonable doubt as to defendant's sanity. Failing to arrive at a majority opinion on this issue, *Cole* is of limited precedential value.

We are persuaded that the testimony adduced from lay witnesses on the basis of their opportunity to observe defendant is admissible. In *People v Hannum,* 362 Mich 660, 665; 107 NW2d 894, 896 (1961), the Court defined the question of admissibility of lay witness testimony regarding the sanity of defendant as being one of weight and not admissibility. There, objection was made to the testimony of three police officers who had observed the defendant for a short period of time prior to her arraignment in the shooting death of her husband. Each officer testified that defendant was sane. Defendant argued that the lack of proper foundation in addition to the lack of sufficient opportunity to observe the defendant rendered the testimony incompetent, citing *People v Zabijak, supra.* The *Hannum* court distinguished *Zabijak* in stating that the latter testimony did not consist of lay witnesses' opinions of defendant's insanity, but rather their conclusions as to what facts there were about defendant from which insanity might be inferred. The instant case does not fall within either category. Each witness responded negatively when asked if defendant's conduct was unusual or any degree of intoxication existed. The nature of the testimony in each case confirmed defendant's sobriety and sanity rather than revealing any unnatural conduct or language. This distinction is made clear in *People v Hannum, supra,* at 663–664; 107 NW2d at 896:

"Defendant says the officers in the instant case did not have ample means to observe and form conclusions. In *Zabijak,* however, the testimony held properly excluded did not consist of the lay witnesses' opinions of

defendant's insanity but rather their conclusions as to
what the facts were about defendant from which insan-
ity might be inferred. Also, it is to be observed that in
*O'Connor* and in *Zabijak* the test laid down was for
qualification to testify as to insanity. In the case at bar
the situation is reversed, the question going to compe-
tency of evidence of sanity. In *People v Borgetto,* 99
Mich 336, 341, 342 [58 NW 328, 330 (1894)], this Court
said:

" 'The subject has recently been discussed in the case
of *O'Connor v Madison,* 98 Mich 183 [57 NW 105
(1893)], where the authorities are collected, and where
it is held that a witness cannot be permitted to state
that a testator was mentally incompetent until he has
detailed some circumstances which the court can say
tend to show it. * * *

" 'But there is a difference in the nature of the
testimony requisite as bases for opinions in the 2 cases
of sanity and insanity. The former is the normal condi-
tion; the latter, the abnormal. The latter is based upon
unnatural conduct; the former may safely rest upon the
absence of unnatural action or language. Once it is
shown that the witness has a sufficient acquaintance
under circumstances that give a reasonable opportunity
for judging, and the testimony that he saw nothing
unusual or abnormal is competent. What is required to
show a sufficient opportunity depends upon circum-
stances which may properly move the judicial discre-
tion, the testimony being more or less valuable as the
circumstances are convincing. In the language of that
case, when "taken as a whole, they move the judicial
discretion of the trial judge, by apprising him that the
witness may believe in the competency of the person
upon reasonable grounds," the opinion may be given.' "

The testimony of the witnesses was properly
admitted. No objection was made to the admission
of testimony from witnesses who had seen defend-
ant throughout the course of the evening. The
matter involved a question of weight to be given
the testimony rather than one of admissibility.
*People v Hannum, supra,* at 665; 107 NW2d at

896. The record indicates that no motion for new trial was made by defendant, nor does defendant argue on appeal that the conviction was against the weight of the evidence properly determined by the jury. The thorough cross-examination as to the opportunity and ability to observe the defendant establishes a sufficient basis for the witnesses to testify as to the appearance and demeanor of defendant. The admission of expert witness testimony of sanity and insanity creates considerable doubt as to whether the lay witness testimony on that point would have created any substantial error resulting in a miscarriage of justice. Accordingly, reversal on this issue is not warranted. MCLA 769.26; MSA 28.1096.

Defendant next contends the trial court erred in permitting the psychiatrist who examined defendant in order to determine his competency to stand trial to testify as to defendant's sanity at the time of the offense. A review of the record does indicate that the people's psychiatrist based his sanity opinion solely upon the basis of the forensic examination for the purpose of determining competency to stand trial. MCLA 767.27a(4); MSA 28.966(11)(4) provides, *inter alia:*

"Upon receipt of the diagnostic report and recommendations the sheriff shall immediately return the defendant to the committing court and the court shall immediately hear and determine the issue of competence to stand trial. The diagnostic report and recommendations shall be admissible as evidence in the hearing, but not for any other purpose in the pending criminal proceedings."

We are aware of *People v Martin,* 386 Mich 407; 192 NW2d 215 (1971), *cert den,* 408 US 929; 92 S

Ct 2505; 33 L Ed 2d 342 (1972),[2] which precludes a
psychiatrist who conducts a forensic psychiatric
examination for the purpose of determining com-
petency to stand trial from testifying during crimi-
nal proceedings on the issue of insanity if objection
is raised by defendant. However, the decision in
*People v Woody,* 380 Mich 332; 157 NW2d 201
(1968), is controlling. There, the Court reserved
decision on the right of the people to use testi-
mony of the examining psychiatrist because it was
not raised at trial. We do likewise. The error
contended was invited by defendant by stipulating
to the use of the testimony in a pretrial agree-
ment. Defendant's lack of objection below did not
properly preserve the question on appeal.

The photographs of the deceased which were
admitted into evidence are said to be sufficiently
inflammatory and prejudicial to constitute revers-
ible error. The people maintain that the photo-
graphs offered probative evidence relating to the
deliberate and premeditated nature of the killing.
A total of eight photographs were shown to the
jury depicting the slain police officer in relation to
the surrounding scene of the crime. Defense coun-
sel was fully prepared to stipulate and concede the
position of the deceased's body in relation to the
surrounding area. We do not think it necessary for
the jury to have viewed eight photographs and
disapprove of their admission, but we do not find
this error to be of reversible magnitude. Owing to
the fact that the defendant would never have
conceded premeditation and deliberation, it was of
probative value to permit the jury to view photo-
graphs of the deceased in order to demonstrate the
malicious nature of the killing. Where photo-

---

[2] This case was decided 47 days after the commencement of trial in
the instant case.

graphs which tend to prove deliberation and premeditation are offered to acquaint the jury with the circumstances surrounding the scene of the crime, their prejudicial effect may be outweighed by their materiality. *People v Surles,* 29 Mich App 132; 185 NW2d 126 (1970). Only those pictures which assist the jury in determining this information should have been admitted into evidence. Defendant's state of mind and the surrounding areas involved could have been determined without the jury being exposed to all of the photographs submitted. In examining whether the photographs were "substantially necessary or instructive to show material facts or conditions" or merely "calculated to excite passion and prejudice",[3] we believe the former most accurately describes the instant case, and find no reversible error.

Finally, defendant argues that the trial court erred in imposing a sentence of life imprisonment upon a conviction of second-degree murder by stating his belief of defendant's guilt of murder in the first degree, a crime for which defendant had been acquitted. At sentencing, the judge expressed his opinion that defendant had committed a "cold-blooded, deliberate, premeditated murder". This observation is said to constitute an independent finding by the trial court of defendant's guilt of a crime for which he had not only not been convicted,[4] but was in fact acquitted.[5]

The sentence of life imprisonment for second-degree murder is within the statutory provisions

---

[3] *People v Eddington,* 387 Mich 551, 562, 563; 198 NW2d 297, 301 (1972).

[4] *People v Grimmett,* 388 Mich 590; 202 NW2d 278 (1972).

[5] Defendant cites *Price v Georgia,* 398 US 323; 90 S Ct 1757; 26 L Ed 2d 300 (1970), in arguing that acquittal of a greater charge is implied by a conviction on a lesser included offense.

set forth in MCLA 750.317; MSA 28.549.[6] Sentences falling within the statutory limit are reversed only in the most extraordinary circumstances. This Court stated in *People v Pate,* 2 Mich App 66, 68; 138 NW2d 553, 554 (1965):

"When a sentence is within the maximum provided by statute, the trial court has wide discretion and an appellate court does not have supervisory control over the punishment."

See, also, *People v Pollard,* 33 Mich App 114; 189 NW2d 855 (1971).

While the trial court's remarks were perhaps intemperate, the record does not reveal that his opinion regarding the defendant's conduct formed the basis for imposing the maximum sentence allowable. Accordingly, defendant's sentence within the statutory maximum was proper.

None of the issues discussed presents sufficient grounds to reverse the decision of the trial court.

Affirmed.

R. B. BURNS, P. J., concurred.

O'HARA, J. *(concurring in result).* I concur in the result reached by Judge FITZGERALD on the ground that at a pretrial conference the defense stipulated clearly and unequivocally that the psychiatrist who conducted the examination at the forensic center to determine the defendant's competence to stand trial could be called as a witness by the prosecution in the case in chief.

The unchallenged affidavit of defendant's trial counsel attached to appellee's brief recites that his agreement to allow the examining psychiatrist to

---

[6] "All other kinds of murder shall be murder of the second degree, and shall be punished by imprisonment in the state prison for life, or any term of years, in the discretion of the court trying the same."

testify was part of his trial strategy, that he was aware that the testimony would have been inadmissible had objection been made, and that all of the psychiatrist's testimony was within the scope of defendant's pretrial agreement with the special prosecutor who represented the state.

I feel it necessary to write this separate concurrence because of my language in *People v Schneider,* 39 Mich App 342, 345; 197 NW2d 539, 540 (1972), that the practice of calling the examining psychiatrist of the forensic center as a witness in the case in chief was to be discontinued in the trial courts.

Further, I adhere to my holding in *People v Spruytte,* 48 Mich App 135; 210 NW2d 155 (1973), that record deficiencies cannot be cured by attaching after-the-fact affidavits to briefs. However, since *Spruytte* was not released until after the briefs were filed in this case, I do not regard it as binding on me in the case at bar. I concur in affirming the conviction.